3-090-065 Leonard Pevnicka and Trish Pevnicka Appellants by Sally Domenico Visit by Edwin Vinicius, Kenji et al. and police by Dana Barrett Counsel Your Honor This case comes before the court on two bases One is a manifest weight of the evidence and the other one is on a what we believe to be prejudicial error caused by the admission of testimony regarding the military service of both of these physicians Briefly, from a factual standpoint my client Mr. Pevnicka was a diabetic patient 45 years old who had been on a transplant waiting list for quite some time ended up getting a transplant about 9 or 10 months prior to this incident and diabetics get a pancreas and a kidney transplant and because they're on anti-rejection medication they're immunocompromised or considered immunocompromised He ended up stubbing his little toes on some furniture one day and he buddied up the two toes as he was taught to do with a band-aid because he had a breach in his skin and he was obviously concerned about infection as any diabetic would So after three days when it wasn't getting any better he ended up going to the emergency room at St. Joseph's in Joliet and in the process of doing so he came to see the first emergency room physician, Dr. Edward Beguia and during that time Dr. Beguia noted that he had a condition known as lymphangitis and cellulitis which is a redness that had traveled on top of his foot and, although it's somewhat in dispute about 2 or 3 inches or so below his knee and what Dr. Beguia did, there's no dispute about this is that he drew a line on the patient's knee or below the knee on the shin and he said if it gets any worse than this, please come back especially if it's traveling He gave him Levaquin at that time which is a broad spectrum antibiotic but it's an antibiotic that only covers for anaerobic bacteria not anaerobic bacteria which is bacteria that doesn't need air to grow Other than doing that there was minimal to no further testing and he sent him on his way My client continues taking the Levaquin which is a 10 day course he took it for the entire time the toes were not getting better and as a matter of fact, although this is somewhat in dispute, his foot started becoming more black and blue and he became very concerned about that and he went back to the emergency room on December 30th, 8 days later and at that time was under the care of the emergency room physician Dr. Zwolski who's the other defendant in this case. Dr. Zwolski at that time did a whole battery of tests. There was some concern that the patient might be developing osteomyelitis or infection of the bone and in addition to CBCs, x-rays, etc. He's concerned enough where he actually calls the patient's treating physician, Dr. Barbara Freeman and makes an appointment with her. Now the reason why Mr. Hayabika had not seen Dr. Freeman initially was because this unfortunately happened during the Christmas holidays. Her practice had shut down and although Dr. Dr. Zwolski was able to get a hold of her he tells my client that he had made an appointment for her to see her after the New Year when she was going to reopen her practice on January 2nd and it's an important issue because of the fact that that phone call showed that there had to be some follow-up or some concern on his part in order to have Mr. Hayabika evaluated. Now when he does come back and sees Dr. Freeman she does what's called a direct admit where she sends him immediately to St. Joseph's Hospital. There's an infectious disease council. She apparently believes at that time that he had gangrene on his foot. Turns out he did. Long story short after he gets transferred to Northwestern he has an amputation of basically half of his foot. Now the jury in this case heard from four witnesses and four expert witnesses and two defendants. Dr. Sigretti and Dr. Rosenberg were plaintiff's infectious disease and emergency room physicians respectively and Dr. Zarr and Dr. Zunn were the defendant's emergency room and infectious disease experts. And the testimony with respect to the whether or not this patient should have been put on broader spectrum antibiotics that would have covered for anaerobic coverage. Now all the experts agree that the Levaquin does a very, very poor job covering for anaerobic bacteria. And it turns out that he had an anaerobic infection which led to the loss of his foot. Now in we believe that the manifest weight of the evidence and there was only one of the defendant's witnesses similar to the Reardon case and that was Dr. Zarr all believed that this patient was at an increased risk of developing an infection because he was immunocompromised. There was no dispute that Levaquin does not cover for anaerobic bacteria. And only Dr. Zarr was the only witness who said that it was due to the reason why he lost his foot was due to the fact that he had a compromise in the circulation of his lower foot. Now that's clearly disputed and it's also not even supported by the record because Dr. Segretti had testified that the studies that had been done of his leg and his foot showed that he had good collateral circulation. So that was not an issue at all. So everybody basically agreed that because of an increased risk of infection that this patient had and the fact that Levaquin does not cover for anaerobic bacteria, he was at an increased risk for developing this condition. Wasn't it disputed as to whether anybody should have diagnosed and treated for an anaerobic infection at the emergency room? We can see that at least in the first visit there was really no evidence of any type of an anaerobic process going on. But certainly during the second visit on December 30th where he's got darkness blueness of his foot, that is the first sign whether he was at an increased risk. So there's no dispute as to that issue, yes. But more importantly with respect to this case is the testimony regarding the military service of these physicians. Now, in the motions in Limini initially there was argument by myself that the military service of these two physicians should not be coming into this case because of the fact that it really had no bearing on the manner and care of the treatment that they performed on him. What did they do in the military? Well, with respect to Dr. Zvolsky specifically, there was more testimony than there was respect to Dr. Zvolsky. They were physicians, right? They weren't infantrymen. Well, that's correct. They acted as physicians. But this was after the fact. It had nothing to do with their experience before this incident happened because they didn't go to Iraq until after this case had already been filed. In fact, as I mentioned in the brief, the case had been put off for Dr. Zvolsky to come back from his tour of duty in Iraq. But the issue since it was last year in Ohio, I think it was probably in June of 2008, the important factor with respect to the military service is, as I mentioned in the brief, and I think the courts can take some judicial notice of this, is that there is a strong concern for anybody who is going to Iraq, Afghanistan. And we didn't need or want that with respect to prejudicing the jury in any way so that the jury can stay focused on the issues of the case. If a plaintiff had gone to Iraq, would that be, should that be kept out? I think it should have because it would have nothing to do with his foot again. It would have nothing to do with the infection. It would have nothing to do with how he would carry on his life. Unless it impacted in some way on some sort of stress disorder that he may have had, it would impact on damages only. But with respect to the background of these two physicians, although this is part of their background, it really had nothing to do with the issues in the case. And we cited the cases that we cited for the court, specifically Cartwright, which we believe is on all fours on that case, where credibility was somewhat of a concern. Although the defendant admitted, and that's the case where the tire blew out and there was a product liability lawsuit that was filed, the plaintiff came in with a letter showing the military bravery that this particular plaintiff had shown. And although the letter could not come in, the testimony had come in from the plaintiff that he was a war hero, had been heavily decorated, and on and on and on. The jury returned a substantial verdict, almost $11 million in their favor. On the post-trial motion, they tried to get the verdict reversed, even though the plaintiff had argued that because it was a product liability case, as to what had happened, that there was injury, the military issue really had that much of a bearing on the jury's verdict. But it did. It had enough to make it prejudicial because if credibility was a factor, as it was in that case to some degree as to how the accident happened, credibility in this case was injected as well. And the court may recall from the brief that initially the defendant had conceded during the opening statement that they were not blaming the plaintiff at all for not coming back, for any contributory negligence at all. There was no affirmative defense and there was no contributory negligence pledged. But yet at the same time, they were arguing the fact that he had not followed up or something that happened in the interim, meaning between December 30th and January 2nd, which led to the loss of foot and some other process that occurred during that time, and that he had not followed up. Where the plaintiff had followed orders of his physician throughout the entire time. He took his love appointments and he was told to do. He came back on the 30th only if it got worse, as he was instructed. The defendant explained it away by saying he was only coming back for a recheck, which is absurd. If he's getting better, he's not going to come back to get a recheck. But the other cases that we cited with respect to military service, and it does have an effect, is the U.S. v. Caputo case. In that case you had military vets who had suffered substantial injury, and the court there said that the emotional impact that testimony would have by having these vets with injuries there far outweighed any probative value. There was no probative value in this case to have the military service, especially towards an attack, which I think certainly the courts, again, can take some judicial notice, that it conjures an emotional effect in all of us when we have our young men over there fighting this particular war. And especially when Dr. Zwolski testified that he's got a wife and some kids, and that he and his wife were discussing, and then finally the judge cut him off when I objected. But it does have an impact on a juror. Isn't that why lawyers always introduce me to have some impact, I suppose? You introduce your client to the jury, you go through their background. Every trial out here, don't you? Absolutely. And there's nothing wrong with giving the juror some background of your client, unless it has a potential prejudicial impact on the outcome of the case. If somebody were to say, this is a military hero, everything a trial lawyer does is intended to have a prejudicial impact. Is it not? That's the idea of trying the case. Is it fair? I mean, why put on a case if you're not trying to get the jury to go your way? I would agree with the court. I've been trying cases 22 years. And I would agree that you're always trying to put your best foot forward in front of the jury to get them to come to your side with the facts. However, you should not put facts out there that are prejudicial, because it's prejudicial to both sides. Wouldn't you agree? It's not whether every fact is intended to be prejudiced that you put on. It's unduly prejudiced, right? Correct. Would that be a more correct statement? Absolutely. And I think in this case, the central issue is, did the issue about their military service in Iraq have a substantial prejudicial effect on the outcome of the case? Counsel, you have two minutes. And the Cartwright case, the Caputo case, does it clearly show that it has impact on jurors? What I'm having difficulty understanding is, you allow both sides to give a presentation of their client and what their client's about. And if the client's a clergyman, they say the client's a clergyman for so many years, or a priest, or a doctor, or a teacher. That's something about the client. And in America, if a person was a Civil War veteran, they put that in. World War II veteran, they put that in. Well, the case law is clear that you can put it in, as long as you don't elaborate on the type of service. And that's the best versus best case. You can put background in as long as you don't elaborate. And that's what was going on here. There was an elaboration. And I may remind the Court that the record supports that during the motion, defense counsel represented to the Court that the only thing he was going to put in is he answered right to this question, as we stated in our brief, the fact that it was just going to be rank in what they basically did. But that's not what happened. It's not just presenting the plaintiff on an opening statement or a closing argument. This particular type of testimony was not only an opening statement during the course of questioning, and then again in closing argument. It was stressed to the jury. And it was stressed to the jury that my guy, in essence, if you want a theme to the case, my guys are good guys. They're good people. And they care about their patients. Good soldiers. And that did and does have a severe prejudicial effect on the issues of the case, which are simply diagnosis and whether or not they properly diagnosed this plaintiff and what he was suffering from. That's all that really mattered in this case. Wasn't one of the doctors more substantially introduced than the other? Yes, that was Dr. Swolsey, the second one. And that's the critical one because of the fact that he's the one who had an impact as to whether or not this patient was going to be admitted or not admitted to the hospital at that time. And so certainly the credibility aspect, whether did the patient have a gangrenous foot at that time or not a gangrenous foot at that time was a very important factor in the case. Thank you. Thank you. Counsel? Good morning. May it please the Court? Counsel? I'd like to start with the question that Justice Schmidt asked the appellant's lawyer about. Don't trial lawyers always put on evidence that prejudice is the other side? The issue here on Dr. Swolsey's military service really is was the admission of the evidence of his service and Dr. Vigia's an abuse of discretion and did it deny the plaintiff of a fair trial? The answer to both of those questions is no. The reason their military service was relevant was because both physicians were named as Supreme Court Rule 213 F2 witnesses to testify as experts in their own behalf. So they were not only defendant physicians in this case, but they were also testifying as experts. Under the Jones v. Rallo's case, when a physician is sued for medical malpractice and he or she is named as an expert in his own behalf, all of that physician's training, expert experience, expertise, qualifications and credentials, all of that information is relevant to show the basis of their giving opinions in their own behalf. And that's what Dr. Swolsey was doing when he talked about his military service. Contrary to what the appellant says, he didn't dwell on his service. He only testified to the fact that he was in the Navy Reserves, his rank as an officer, that he served as a physician for the Marines, because the Marines don't have their own physicians, and that he was deployed to Iraq. And he was deployed to Iraq as a physician. He was practicing medicine the year he was there. And that was the extent of his testimony. It was mentioned in an opening statement, and it was also mentioned in closing. And when Dr. Swolsey testified to his credentials, he did that in the context of discussing all of his other credentials as an expert. So under Jones v. Rallo's, all of that information about Dr. Swolsey was relevant up to the day of trial. Even though his military service occurred after the occurrence at issue, and after this case was filed, an expert is constantly reviewing materials up to the day of trial, and at the trial he's serving as an expert. Dr. Swolsey reviewed depositions of the plaintiff's experts, and they're constantly reviewing after their own deposition all of the matters in the case that require an expert opinion. So for that reason, his military service and everything he did up until the day of trial was relevant for the jury to hear, because the jury has to be able to evaluate the credibility of a witness and establish what weight to give their testimony. And that's the testimonies that Dr. Swolsey provided. The cases that the plaintiff cites to are distinguishable. The U.S. v. Caputo case and in Cartwright v. Goodyear, neither of those cases involved veterans who were serving as experts. Both of those cases involved veterans who were also plaintiffs and were testifying as plaintiffs and in the context wanted to present their military service. U.S. v. Caputo involved veterans who had severe eye injuries after using certain medical products, and the court felt that if the jury were to see these partially blinded veterans testifying as plaintiffs about their injuries, the fact that they were veterans would make the jurors more sympathetic to them. In the Cartwright v. Goodyear case, that was another plaintiff who all of his testimony was fraudulent. He testified to a number of medals he had received. He testified to claimed heroic feats in battle. Well, he wasn't in the military, but he was a desk clerk stateside. He never saw any deployments to a battlefield in the court. Again, he was testifying as a plaintiff. He was not testifying as an expert. That's the difference between their military service and Dr. Zawalski's service here. There was another question that Justice Schmitt asked plaintiff's counsel on the other issue of this case, whether the jury's verdict was against the manifest, whether it be evidence. And the appellant was asked, wasn't it disputed, whether Leonard Pabneka had an anaerobic infection or whether there was evidence of an anaerobic infection, and that was indeed disputed. The appellee's experts, Dr. Leslie Zahn and Dr. Fred Zahr, both testified and the plaintiff's own expert, John Segretti, agreed there was no evidence of an anaerobic infection on December 22, 2003, and there was also no evidence of an anaerobic infection on December 30, 2003. The only party who testified that there was a color change to his foot was the plaintiff. There's no color change documented in the doctor's notes on either of those visits, and there was no color change noted by the defense experts who reviewed the case. Dr. Zahr gave specific reasons why there was no evidence of an anaerobic infection in this case. He said that on both emergency room visits there was no foul odor to the wound, which is a hallmark characteristic of anaerobic infections. Dr. Zahr also testified that on palpation of the wound there was no finding of gas. He used the medical term crepitus. He said it feels like you're popping bubbles in bubble wrap, and that's what it feels like when there's an anaerobic infection. There was no finding of that on either emergency department visit. And finally, the x-ray that Dr. Zwolski did on December 30, there was no finding of x-ray on the gas. There was no finding of gas on the x-ray. I'm sorry. Dr. Zahr testified that in the complete absence of those signs and symptoms of an anaerobic infection, there was no clinical indication for them to believe he had an anaerobic infection, and therefore the choice of appropriate antibiotic to treat his infection. Dr. Zahr went further to state that in his opinion, there was a change to the wound after the December 30 emergency department visit. When he saw Dr. Freeman on January 2, 2004, three days after he had last seen Dr. Zwolski, that was the first evidence in the medical record that of an anaerobic infection, that there was a recall of his foot. And Dr. Zahr explained that it's possible, especially in a diabetic with compromised blood flow, that another bacteria entered the wound, and that's when the condition in his wound changed. It was after he saw Dr. Padilla, and after he saw Dr. Zwolski. As to the issue of the blood flow, there's also a dispute on that. Leonard Pevnica had an MRA, a magnetic resonance angiogram, performed at Northwestern Memorial Hospital. And that test showed that he had severe vascular disease to his foot and his toes. Dr. Zahr testified that when you have vascular disease to that extent, caused by years of diabetes, as Leonard Pevnica had, Dr. Zahr said once he got the infection, it was almost inevitable that his foot would be amputated. Again, the plaintiff's expert agreed with the defense. Dr. John Sobretti agreed that when the vascular flow is that compromised, he said it almost doesn't matter what you do. You're going to lose your foot. Plaintiff has argued that the evidence in this case was against, or that the jury's verdict was against the manifesto of the evidence. But the case law provides that it's the jury's function to assess the weight and the credibility of all of the witnesses' testimony, including the experts. And the case law also provides that a reviewing court should not re-weigh the evidence and substitute its judgment for that of the jury. The arguments plaintiff is making really are just the stock arguments that a party makes when they're dissatisfied with the verdict. Because when you evaluate the evidence in light of the case law and what the jury's function is in the judicial process, it's clear that the standard of care was met by both doctors, that labacone was the appropriate antibiotic to treat him, and that their actions did not approximately cause the amputation to his foot. There are just two more notes I'd like to make. One is in the plaintiff's brief, I'm sorry, the appellant's brief, pages four through six, he referred to the evidence deposition of Deborah Freeman, but he didn't attach that deposition to the record. And we would argue that any arguments he made, and in fact he did talk about when she saw him and hospitalized him, we would respectfully ask that any arguments he made about Dr. Deborah Freeman be disregarded because although her evidence deposition was taken and it was read at trial, he didn't attach it to the record, so that record is not before the court to review. The other note is that the appellant didn't file a reply brief here. Although he's entitled to rebuttal, under Supreme Court Rule 341 and the case law, he's not entitled to go beyond any of the arguments he made in his initial brief when he had the opportunity to file a reply brief and did not. So we would ask that if he responds in rebuttal and if he goes beyond the arguments made in his initial brief, we would respectfully ask that those arguments be disregarded. And if the justices have no questions, that concludes my movement. Thank you, Counsel. Thank you. I think, not to beat a dead horse, but I think it's a little disingenuous to argue that the military service perspective Dr. Zwolski was innocuous and not prejudicial. It wasn't just simply glossed over or simply stated to the jury. As I cited in my brief, Dr. Zwolski went to the extent of talking about volunteering a second time for military service, specifically with an infantry unit in Iraq. And then during the closing argument, Mr. Redman argued, and you heard about the background and training of these gentlemen. You heard about a Dr. Zwolski who volunteered to go to Iraq to treat soldiers. I object. Mr. Redman, these are people who take their job seriously. I object again. And this time the court said overrule, and then switches and changes her mind, sustaining the objection at that point. And despite that, again, Mr. Redman says, these are doctors who take their job seriously. When you couple the testimony as close as it was in this case on issues of credibility with respect to whether or not this individual did or did not have a possible anaerobic infection going on, at least with respect to that second visit, which is a crucial visit as to whether he should or should not have been hospitalized at that point, it can and does have a severe prejudicial effect sufficient to sway a jury in one direction. They would perhaps believe the volunteered physician who goes to Iraq to fight for his country, who somehow is potentially going to have more credibility, who takes his job seriously, as opposed to a patient who is simply saying, this is what I have. Well, he wasn't fighting for his country. He was treating soldiers, I assume, for battlefield injuries. True. He didn't pick up a gun. There's no evidence that he did. But he's there serving his country without question, taking care of our guys. And I really do believe, and of course the court only has the benefit of the written word here, but the benefit of the jury listening to that testimony is very powerful. And the cases are clear with respect. Even the Jones v. Rallo case does not give somebody unfettered right to simply talk about a background. That case specifically dealt with the fact that the plaintiff's attorney inquired into the fact that that physician had flunked the board certification exam. And that's part of the background. And the court said you can't go into that unless the physician is going to testify to standard of care, because it's not relevant and it can have a prejudicial effect. So we have precedent to say that merely because this is all part of their background, it doesn't necessarily mean that it should be let in if it's going to have a potentially prejudicial effect. And again, I go back to the ruling by the court, by Her Honor, Judge O'Leary, who was specifically assured, as was I, that all we were going to simply discuss with respect to the military issues was their rank and very, very small substance of what they did, period. No elaboration, which is what the case law holds. That there should be no elaboration on that point. Let me just ask you real briefly, what if the physician said, the expert says, and I get two weeks off, and during those two weeks off, I go down and volunteer my time at Children's Hospital in Memphis and treat little kids with cancer. And again, if that was testimony as to their background, what value would that have on a jury versus what prejudicial effect it may have on the other party, in terms of swaying that, like, what a great guy that's going down, treating children, volunteering his time. He's saying, I practice medicine 52 weeks a year, and when they give me two weeks off here at this hospital, I'm practicing medicine. Doesn't that go to his credentials? It may, but we have a very, very emotional issue with respect to the Iraqi war and what's going on. And that's been from the very beginning. And as a consequence, it has, I think, a stronger impact than perhaps a physician who does volunteer his time as part of his background. So I think it was put forth more for the emotional lightning rod effect than it was for purposes of their background. And I think the evidence bears that out based on the testimony that was elicited and the argument that was made, not only in opening, during questioning, but in closing argument. Thank you. The court will take this case under advisement and a decision will follow.